UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 OCT 23  AM 11: 12

CLERK
BY_____
DEPUTY CLERK

PATIENT A,                              )
                                        )
    Plaintiff,                          )
                                        )
    v.                                  )     Case No. 5:14-cv-000206
                                        )
VERMONT AGENCY OF HUMAN                 )
SERVICES, VERMONT DEPARTMENT            )
OF MENTAL HEALTH, PAUL DUPRE,           )
COMMISSIONER OF DEPARTMENT OF           )
MENTAL HEALTH, in his individual and    )
official capacity, CORRECT CARE          )
SOLUTIONS, VERMONT DEPARTMENT           )
OF CORRECTIONS, and ANDREW              )
PALLITO, COMMISSIONER OF                )
DEPARTMENT OF CORRECTIONS, in his       )
individual and official capacity,        )
                                        )
    Defendants.                          )

## OPINION AND ORDER RE:
## DEFENDANT CORRECT CARE SOLUTIONS'S MOTION FOR SUMMARY
## JUDGMENT
### (Doc. 47)

Plaintiff Patient A has filed suit against the Vermont Agency of Human Services

("AHS"); Vermont Department of Mental Health ("DMH"); Paul Dupre, Commissioner of

DMH; Correct Care Solutions ("CCS"); Vermont Department of Corrections ("DOC"); and

Andrew Pallito, Commissioner of DOC. He alleges that he suffered psychological and physical

injuries during his incarceration from August 13, 2013 through April 3, 2014. In particular, he

alleges that he was mistreated during his incarceration at Southern State Correctional Facility

("SSCF") – a state prison in Springfield, Vermont. His claims concern the conditions under

which he was held, especially his long stay in solitary confinement, and the lack of appropriate

medical care while he was isolated from contact with others.

Patient A claims that CCS—the company which contracts with DOC to deliver medical and

mental health care to inmates—committed medical malpractice. CCS has moved for summary

1

judgment on this claim. A hearing on the Motion was held on September 10, 2015. Filing of post-hearing memoranda was completed on September 15, 2015. For the reasons stated below, CCS's motion for summary judgment is DENIED.

**I.    Facts**

The following facts are drawn from the complaint, the parties' statements of undisputed material facts, and from the parties' exhibits. The facts are undisputed unless noted otherwise.

Patient A has a history of Autistic Spectrum Disorder (Asperger Type), and Attention Deficit Hyperactivity Disorder ("ADHD"). (Doc. 55-9 at 17.) He was incarcerated at Northeast Regional Correctional Facility in St. Johnsbury, Vermont on August 13, 2013 for an alleged parole violation. (Doc. 1 at 3.) Shortly after he was incarcerated, DOC designated Patient A as a "seriously functionally impaired" inmate. (*Id.*)

On August 30, 2013, DOC transferred Patient A to SSCF where it maintains a special unit for prisoners with psychological problems. (*Id.*) CCS contracts with DOC to provide physical and mental health care in this setting as well as elsewhere in the Vermont prison system. (Doc. 55-8.) During his time at SSCF, Patient A spent much of his time in segregated confinement. (Doc. 1 at 3-4; doc. 47-1 at 1.) His condition "dramatically worsened." (Doc. 1 at 5.)

Patient A experienced severe mental health issues in February 2014. (Doc. 55-10 at 2; doc. 55-2 at 2.) SSCF incident reports document his paranoia, self-harming behavior, and descent into "some kind of mental break down" as early as February 8, 2014. (Doc. 55-10 at 2-7.) CCS progress notes reveal that Patient A suffered from hallucinations and paranoia. (*Id.* at 8-15.) He refused medication and some meals because he believed they were poisonous; he banged on his cell door and screamed loudly; and he reported hearing voices coming through a vent. (*Id.*)

DOC and CCS recognized that Patient A needed inpatient psychiatric care, and he was placed on a waiting list for a bed in a psychiatric hospital. (Doc. 47-1 at 2.) Despite his condition, Patient A remained isolated in a cell for approximately twenty-three hours a day, went as long as ten days without seeing a mental health worker, and only saw a psychiatric nurse

2

practitioner twice and a psychiatrist once. (Doc. 55-2 at 3.) On April 4, 2014, he was transferred to Green Mountain Psychiatric Care Center ("GMPCC") in Morrisville, Vermont.[1]  (Doc. 1 at 3; doc. 55-9 at 2.)

Upon admission to GMPCC, Patient A was examined and diagnosed with a psychotic disorder, not otherwise specified. (Doc. 55-9 at 2-3.) This diagnosis was subsequently specified as Schizophreniform disorder. (*Id.* at 5.) According to GMPCC records, Patient A exhibited delusional thinking, disorganized speech, and "persecutory ideas." (*Id.* at 2-3.) Patient A reported having been "tortured in corrections," stating that corrections officers threw darts at him as he slept. (*Id.* at 2.) He stated he was awaiting the receipt of one trillion dollars—which he subsequently amended to $37 trillion—that he was owed as a result of winning a sports bet. (*Id.*) Patient A also reported that corrections staff put "wires in my head, metal wires," which spoke messages to him as a torture device. (*Id.*) He reported that he lost thirty pounds while incarcerated, although his BMI was recorded as normal. (*Id.* at 4.)

At GMPCC Patient A began taking his medications as prescribed and his condition improved significantly. (*Id.* at 4-5.) His mood improved, he began thinking more clearly, and he stopped hearing voices. (*Id.*) On June 13, 2014, GMPCC began planning Patient A's discharge into the community. (*Id.* at 6.)

## II.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting that a fact is genuinely disputed must cite to "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury

---

[1] Patient A's Complaint notes that this facility is currently known as Vermont Psychiatric Care Hospital. (Doc. 1 at 3.)

verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (internal quotation marks omitted).

The burden is on the moving party to show that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The non-moving party receives the benefit of favorable inferences drawn from the underlying facts. *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). However, allegations that are "conclusory and unsupported by evidence of any weight" are insufficient for the non-moving party to withstand a motion for summary judgment. *Smith v. Am. Express Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988).

### III.   Medical Malpractice Claims

Vermont has codified the elements of medical malpractice at 12 V.S.A. § 1908. A plaintiff bringing a claim of medical malpractice must prove:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont;
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

"These elements must generally be proved by expert testimony." *Lockwood v. Lord*, 657 A.2d 555, 557 (Vt. 1994). Expert testimony is required "[e]xcept where the alleged violation of the standard of care is so apparent that it can be understood by a layperson without the aid of medical experts." *Provost v. Fletcher Allen Health Care, Inc.*, 890 A.2d 97, 101 (Vt. 2005).

A plaintiff bringing a medical malpractice claim must also file along with the complaint a "certificate of merit" certifying that the attorney or plaintiff "has consulted with a health care

4

provider qualified [to serve as an expert witness], . . . and that, based on the information
reasonably available at the time the opinion is rendered, the health care provider has:

> (1) described the applicable standard of care;
>
> (2) indicated that based on reasonably available evidence, there is a reasonable
> likelihood that the plaintiff will be able to show that the defendant failed to meet
> that standard of care; and
>
> (3) indicated that there is a reasonable likelihood that the plaintiff will be able to
> show that the defendant's failure to meet the standard of care caused the plaintiff's
> injury."

12 V.S.A. § 1042(a). Failure to comply with this requirement constitutes grounds for dismissal
without prejudice. *Id.* § 1042(e).

## IV. Analysis

The only claim against CCS is one of medical malpractice.[2] In seeking summary
judgment on this claim, CCS argues that Patient A has failed to provide an expert opinion or
other competent evidence in support of the first statutory element—the appropriate standard of
care—and therefore cannot demonstrate medical malpractice as a matter of law. CCS also takes
issue with Patient A's certificate of merit, which it urges is deficient because it offers no opinion
on the alleged medication mismanagement by CCS. Finally, CCS argues that Patient A failed to
exhaust administrative remedies because he never filed a grievance about his allegedly
substandard mental health care while incarcerated.

Patient A responds that the opinion provided by his expert witness Craig Van Tuinen,
M.D. establishes the standard of care which he should have received from CCS. He rejects the
claim that the certificate of merit is insufficient. He argues that the grievance process only
applies to people currently held in prison and that his failure to file grievances while incarcerated
was excused by reason of inability or futility.

---

[2] Although both parties have moved for summary judgment on the medical malpractice claim,
the court issued an order deferring a decision on Patient A's summary judgment motion until
after expert discovery has been completed. (Docs. 47, 55, 68.)

## A. The Standard of Care

It is true that Dr. Van Tuinen's expert opinion has arrived in stages and that it has developed over time. On August 19, 2014—prior to the filing of this complaint—Dr. Van Tuinen provided a report letter to plaintiff's counsel in which he stated an opinion "regarding the care [Patient A] received while in the custody of the Department of Corrections from February of this year until he was admitted to GMPCC on April 4, 2014." (Doc. 55-2 at 2.) After establishing his professional qualifications and describing the sources of information available to him, Dr. Van Tuinen offered the following opinions:

1. In February, 2014, Patient A was in need of inpatient psychiatric hospitalization.

2. His care at DOC from February, 2014 until his admission to GMPCC in April, 2014 fell far below the standard of care provided by psychiatric hospitalization.

3. Notable components of hospital-level care include a calm environment, interaction with patients and staff, the availability of medical staff at all times, close observation and the potential for one to one staffing as needed, the availability of psychiatric nursing and physician care without delay, and regular treatment meetings and attendance in therapeutic groups.

4. The care provided to Patient A by CCS fell far short of these standards.

5. As a result of this neglect, he suffered significant harm.

(*Id.* at 2-4.)

Following the filing of the complaint and in compliance with Fed. R. Civ. P. 26(a)(2), plaintiff provided a formal expert disclosure on April 10, 2015. It was signed by Dr. Van Tuinen. He incorporated his prior opinion letter and provided an additional statement of his opinion. He stated that "the standard of care for mental health treatment was not being met [while plaintiff was in DOC custody] with regard to medication, segregation, isolation and the amount of interaction Plaintiff had with mental health providers." (Doc 55-3 at 3.) He made reference to the specific standards of hospital-level treatment described in his August letter "including daily meetings with nursing staff and the psychiatrist and often other staff, the purpose of which would include appropriate medication management, prescriptions, evaluations, and the like." (*Id.*)

On June 5, 2015, CCS filed its motion for summary judgment. One of its principal arguments is that although Dr. Van Tuinen may have described the standard of care for a psychiatric hospital, that standard is irrelevant to care provided by a medical contractor within a prison setting.

In response, Dr. Van Tuinen provided a third statement of his opinion in an affidavit filed on July 13, 2015. In this affidavit, Dr. Van Tuinen states that he had not intended "to imply that the medical providers responsible for Patient A's care [at SSCF] could only satisfy their duty of care by transferring him to an inpatient psychiatric hospital unit, but rather to convey that those providers were fully aware of Patient A's need for augmented and specialized treatment and supports, which would be found in an inpatient unit, in order to prevent deterioration and preventable harm to Patient A." (Doc. 55-5 at 2.) Dr. Van Tuinen addressed the standard of care for a physician providing service in a prison setting: " . . . a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances as the Patient A's providers in prison would have augmented care within their power and ability to mitigate the harm caused by failure to transfer [to a psychiatric hospital] in a timely manner." (*Id.* at 3.) He identified his prior statements about "the lack of psychiatric care, out of cell time, medication management and rapport building" as examples of the type of care which he believes "the providers in prison should and could have complied with given their circumstances." (*Id.*) In his view, failure "to augment services in an appropriate, reasonable and available manner" caused "significant harm" to Patient A. (*Id.*)

Read fairly, Dr. Van Tuinen is saying two things. First, he believes that by February 2014, Patient A required hospitalization. Instead, he remained in prison. As CCS points out, this is not a decision which can be laid at the door of the medical provider. But second, Dr. Van Tuinen believes that many of the features of in-patient hospitalization can and should be provided to a prisoner receiving care in the prison setting. As his affidavits make clear, frequency of visits by physicians and other professionals, long-term isolation, medication management, and lack of rapport building are areas in which he believes CCS provided an inadequate level of care.

The court turns now from the question of what Dr. Van Tuinen has said to whether his opinion is sufficient to state a case which satisfies the elements of 12 V.S.A. § 1908.

7

As a general observation, the mere fact of incarceration does not justify the delivery of health care lower in quality than an inmate would receive outside of prison. *See* 28 V.S.A. § 801. Often, a medical provider who practices within a jail or prison setting is held to the same standard of care as a provider who practices within the general medical community. *See, e.g.*, *Moss v. Miller*, 625 N.E.2d 1044, 1051-52 (Ill. App. Ct. 1993) (jury instruction erroneously implied standard of care "in the referral of serious eye injuries to a specialist" was more lenient within prison setting than within general medical community). *See also Anderson v. Columbia Cty., Ga.*, No. CV 112-031, 2014 WL 8103792, at \*10 (S.D. Ga. Mar. 31, 2014) ("[T]he correctional setting imposes certain challenges and *administrative* procedures not faced in other settings. However, the Court remains unpersuaded that correctional medicine is a *medical* specialty . . . .").

In some cases the "conditions and facilities available in the locality in question" are determinative of the standard of care a medical practitioner is able to deliver. *Moss*, 625 N.E.2d at 1051. Where this is the case, the defendant medical provider is not held to a standard of care higher than what is possible under prevailing conditions. CCS points to cases in which courts have determined that medical providers could not be held to certain standards of care due to limitations posed by the setting or facility in which the care was provided. *See, e.g.*, *Johnson v. Grant Hosp.*, 291 N.E.2d 440, 445 (Ohio 1972) ("A general hospital, which ordinarily does not and is not equipped to treat mental patients, should not be held to the same standard of care as a hospital which is operated and equipped to provide care for a patient who has displayed a tendency to commit suicide."); *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014) ("[C]ruise lines will not always be held to the same standard of care that would guide treatment onshore.").

Here, however, CCS's own internal policies demonstrate that the conditions and facilities at SSCF were designed and equipped to provide care for patients displaying many of Patient A's mental health issues. For example, CCS's policy on segregated inmates specifically states that "[i]nmates with little or no contact with others are monitored daily by health care personnel" and "[i]nmates who have limited contact with others are monitored three times weekly by nursing personnel." (Doc. 74-1 at 12.) Moreover, "[i]nmates with serious mental illness shall receive daily visits from [an appropriate professional]" and "[t]he needs of inmates who are experiencing

8

a current, severe psychiatric crisis shall be addressed promptly." (*Id.* at 16.) Dr. Van Tuinen was of the same view and provided an opinion that while incarcerated, Patient A should have been observed closely and provided one to one staffing when showing symptoms of acute distress. (Doc. 55-2 at 3-4.)

Dr. Van Tuinen's disclosures do not suggest that he expected SSCF to provide Patient A with every element of care available in an accredited psychiatric hospital. Rather, his disclosures demonstrate his belief that CCS had a duty to provide Patient A with the level of care that would reasonably be expected of health care professionals practicing under similar circumstances with similar resources. *See Provost*, 890 A.2d at 101 (concluding there was fact issue where plaintiff's expert implied standard of care, while reaffirming that "better practice is for the affiant to expressly articulate the standard of care"). He describes this care as an "augmented" standard of care involving increased contact, monitoring, and attention for an acutely ill prisoner within the prison setting. (Doc. 55-3 at 3; doc. 55-5 at 2-3.) As CCS's policies indicate that care of this type was consistent with its own approach to treating prisoners with mental health issues, the court is satisfied that Dr. Van Tuinen's opinion in its final version is sufficient to establish a prima facie case on the element of standard of care.

### A.     Modification of the expert disclosure over time

While some elements of Dr. Van Tuinen's opinion have developed over the course of time, in its final form, the expert opinion satisfies the requirements of Rule 26. The purpose of these disclosures "is to avoid surprise or trial by ambush." *Lopez v. City of New York*, No. 11-CV-2607 (CBA) (RER), 2012 WL 2250713, at *1 (E.D.N.Y. June 15, 2012). Since this litigation is in its earliest stages, CCS can hardly claim to be surprised or ambushed by the refinement of Dr. Van Tuinen's opinion about the standard of care. Additionally, while failure to comply with these rules can result in the exclusion of evidence, district judges are afforded "considerable discretion" on such matters. *See Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988) (in determining sanctions for failure to comply with Rule 26(e), court should consider importance of testimony to case and prejudice to party inconvenienced). Given the importance of Dr. Van Tuinen's opinion to this case and the lack of prejudice the evolution and clarification of his opinion has caused CCS, statements in his original report concerning the standards for a psychiatric hospital and the delay in transferring Patient A to such a facility were

9

harmless. These opinions may be correct, but they do not establish a claim against CCS. Now
that Dr. Van Tuinen has refocused his opinion on whether the care CCS provided in the prison
setting fell short of the standard of care for a provider working in that setting, it would be unfair
to limit the plaintiff to his initial pre-suit disclosure.

### B.     Certificate of Merit

Patient A filed a certificate of merit along with the complaint. The certificate states that
A.J. Ruben, Plaintiff A's attorney, consulted with a health care provider qualified to provide an
expert opinion, and that this individual offered an opinion that: "(1) [d]escribed the applicable
standard of care; (2) [i]ndicated that based on reasonably available evidence, there is a
reasonable likelihood that the plaintiff will be able to show that the defendant failed to meet that
standard of care; and (3) [i]ndicated that there is a reasonable likelihood that the plaintiff will be
able to show that the defendant's failure to meet the standard of care caused the plaintiff's
injury." (Doc. 2-1.) CCS contends, however, that Patient A's certificate of merit is faulty
because Dr. Van Tuinen's report did not discuss the standard of care for managing the
medication of an individual with Patient A's diagnoses and therefore offers no basis upon which
to hold CCS liable for harm due to allegedly "augmenting, discontinuing, and/or initiating new
medications for Plaintiff." (Doc. 1 at 13.)

Section 1042 was enacted as a way to "screen out meritless malpractice claims at the
outset by requiring consultation with a qualified expert at the beginning of a lawsuit." State of
Vt. Agency of Admin. Health Care Reform, Medical Malpractice Reforms Report and Proposal
Pursuant to Act No. 48 of 2011, § 2(a)(7) 12 (2012). In passing the statute, the Legislature
expressed its strong preference for consultation and retention of experts before suit. The statute
requires an attorney or a plaintiff to certify that he has consulted with a qualified health care
professional about each of § 1042's requirements, and that this professional has provided an
opinion that the plaintiff's claims have merit. Section 1042 does not speak to how much detail is
required at the time of suit.

As noted in CCS's statement of undisputed material facts, "[p]rior to the filing of this
suit, Dr. Van Tuinen reviewed Patient A's records and provided an opinion on the applicable
standard of care and Patient A's claims." (Doc. 47-1 at 2.) Over time this general statement has

10

been narrowed to include a more specific opinion about the alleged shortcomings in Plaintiff A's medication regime at SSCF. Dr. Van Tuinen's expert report, disclosure statement, and affidavit all reference Patient A's medication, and together opine that CCS's management of Patient A's medication fell below the standard of care. When discussing the harm Patient A suffered as a result of "the substandard care he received," Dr. Van Tuinen specifically notes that the discontinuation of Patient A's medication happened while under CCS's care. (Doc. 55-2 at 3-4.) In his Rule 26 disclosure statement, Dr. Van Tuinen again references that "the standard of care for mental health treatment was not being met with regard to medication" and that the "notable components of the appropriate standard of care" would have assisted with "appropriate medication management." (Doc. 55-3 at 3.) Finally, in his affidavit, dated July 7, 2015, Dr. Van Tuinen references that his "prior statements regarding the lack of . . . medication management . . . were intended to demonstrate what standard of care I believe the providers in prison should and could have complied with given their circumstances." (Doc. 55-5 at 3.) While these statements are all quite general, the court is satisfied that the certificate served the statutory purpose of requiring the plaintiff to address all elements of the prima facie case with an expert witness before filing suit.

## C.     Exhaustion of Administrative Remedies

CCS also seeks summary judgment because Patient A failed to exhaust administrative remedies prior to filing suit. Specifically, CCS contends that Patient A's claim is barred because he had the option to file grievances contesting his mental health care while incarcerated. Patient A responds that grievances are not required of former inmates, and any failure to file a grievance while incarcerated should be excused by reason of impossibility or futility.

Pursuant to 28 V.S.A. § 854, DOC has promulgated a Directive allowing inmates to file grievances related to a broad range of complaints, including alleged rights violations, unsafe or unsanitary conditions, and "[a]ny other matter relating to access to privileges, programs and services, conditions or care or supervision under the authority of the Department of Corrections, to include rights under the federal Americans with Disabilities Act." (Doc. 47-1 at 3.) The Vermont Supreme Court has "consistently held that when administrative remedies are established by statute or regulation, a party must pursue, or 'exhaust,' all such remedies before turning to the courts for relief." *Rennie v. State*, 171 Vt. 584, 585 (2000) (citation omitted). *See*

11

*also Caviezel v. Great Neck Public Schools*, 701 F. Supp. 2d 414, 424-25 (E.D.N.Y. 2010) (state exhaustion requirement "applies to state claims brought in federal court"); *Salvatore v. Allied Chem. Corp.*, 238 F.Supp. 232, 232-33 (S.D.W.Va. 1965) (when assessing purely state law claim in federal court, "if state law require[s] the exhaustion of . . . grievance procedures as a condition precedent to an action for damages, jurisdiction [is] contingent upon the fulfilment of that condition").

Ordinarily Patient A's "subsequent release [would] not justify [his] failure to exhaust while [he] was still in custody," *Frasier v. McNeil*, No. 13 Civ. 8548 (PAE) (JCF), 2015 WL 1000047, at *3 (S.D.N.Y. Mar. 5, 2015) (considering similar argument under exhaustion requirement of Prison Litigation Reform Act (PLRA)). "[S]pecial circumstances" may justify a failure to exhaust in certain cases. *See Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003). While it is undisputed that Patient A was ill enough to require inpatient psychiatric care, it is disputed whether Patient A was so ill such that he could not effectively utilize the grievance process to contest the care provided to him by CCS during the relevant time period. Accordingly, summary judgment on this issue must be denied. The court need not address Patient A's claims of futility at this time.

## V.   Conclusion

For the reasons stated above, CCS's motion for summary judgment is DENIED.

Dated at Rutland, in the District of Vermont, this 23 day of October, 2015.

Geoffrey W. Crawford, Judge
United States District Court

12